IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CAROLYN TOMASSI on behalf of T.T., | § § § | |
| *Plaintiff*, | § § | |
| *versus* | § | CIVIL ACTION NO. 6:12-1653 |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | § § § § § § | |
| *Defendant*. | § | |

## **REPORT AND RECOMMENDATION**

Carolyn Tomassi ("Plaintiff"), invoking subject-matter jurisdiction under 42 U.S.C. § 405(g), complains of the denial of an application for supplemental security income filed on behalf of her minor grandchild, "T.T."[1]

A reviewing court's limited role under 42 U.S.C. § 405(g) is to determine whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence.[2] *See Lamay v. Commissioner of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009), *cert. denied*, 559 U.S. 962 (2010); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see also* 42 U.S.C. § 405(g). Within the penumbra of this narrow authority, courts make threshold

---

[1] In accordance with Rule 5.2(a) of the Federal Rules of Civil Procedure and 8.1 of the Local Rules for the Northern District of New York, the minor, T.T., will be referred to by initials.

[2] "Substantial evidence is defined as more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept to support a conclusion." *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) (internal quotation marks and citations omitted); *see Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).

determinations as to whether claimants received full hearings in accordance with the beneficent purposes of the Social Security Act. Thus, before district courts evaluate the Commissioner's findings and conclusions, they first ensure that claimants received full and fair hearings. *See Echevarria v. Secretary of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982); *accord Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990). This involves searching investigations of administrative records to ensure that administrative law judges protected claimants' rights. *See Robinson v. Secretary of Health & Human Servs.*, 733 F.2d 255, 258 (2d Cir. 1984).

## I. Background

When T.T. was nine years old, an application claiming entitlement to disability-based supplemental security income benefits was filed in her behalf. The initial administrative determination focused on mental impairments, specifically, diagnoses of oppositional/defiant disorder ("ODD") and attention deficit/hyperactivity disorder ("ADHD"). (T. 73).

T.T. has lived with her grandmother (plaintiff here) from birth. Her grandmother has had legal custody of T.T. since 2001 (*i.e.*, since T.T. was approximately two years old). (T. 46, 150). T.T.'s grandmother is mentally impaired, and receives social security disability benefits herself. (T. 56, 374). Dependent on and living with the grandmother are T.T.'s 8- and 4-year-old sisters and a 6-year-old brother, all fathered by other men. (T. 52, 473). The 8-year-old sister has mental retardation, and also receives supplemental security income benefits based on that disability. (T. 56, 473).

This abysmal state of affairs results in T.T. going to school hungry, with personal hygiene deficiencies and anxiety about her clothing and appearance. (T. 259). She is chronically infested with head lice, a condition that results in

her being sent home from school. (T. 255). She is absent excessively, due in part at least to lack of transportation[3] and frequent disciplinary and health-related suspensions. (T. 48-49).

T.T's father and mother never married, nor did they live together. (T. 473). T.T.'s mother has bipolar disorder, and is a long-time drug addict. (T. 373, 473). She has been in and out of county jail as well as both federal and state prisons (T. 373-74, 473). At times, she has been homeless, sleeping in a boyfriend's car. (T. 374). T.T.'s father has never been involved with T.T.'s life, and currently resides in West Virginia. (T. 374, 473). He uses drugs, is an alcoholic, and also has been jailed several times. (T. 374, 473).

Although still of a tender age, T.T. exhibits distressful behavioral abnormalities. At home, she sometimes goes out of control when she does not get her way. (T. 60, 372). In fits of rage, she breaks things, lies on the ground, kicks and punches walls, screams and hits her siblings and younger cousin, and also her grandmother. (T. 60). This behavior prompted her grandmother to call the police on more than once occasion. (T. 301-02, 304). On May 2, 2011, T.T. told police that she wanted to stab her grandmother with a knife, and was thinking about taking pills or medication to commit suicide. (T. 304). As a result, her grandmother placed T.T. in mental health treatment. (T. 304, 463).

---

[3] T.T. faces transportation challenges because special education officials, in an effort to provide T.T. with more support and assistance, reassigned her to a school in Verona, outside of her zoned attendance in Rome. *See* n. 4, *infra*.

At school, T.T. has received special education services since kindergarten.[4] Notwithstanding tutelage of teachers adept at designing and implementing an Individualized Educational Program ("IEP"), T.T. occasionally does not respond to directions, is insubordinate and wanders the hall aimlessly. (T. 291-92, 300). She has yelled at teachers, intentionally flooded bathrooms, thrown objects within and out of a school bus, written profanity on school bus windows and seats, called other students by profane names, hit students, struck a student with a necklace, missed school frequently (*e.g.,*13 days out of 32 at one point), and committed fourteen disciplinary offenses within a six week period, resulting in various suspensions. (T. 288-92, 295-98, 300, 303).

T.T. has received psychiatric treatment from a psychiatrist, Vijayakumar Komareth, M.D. (T. 464-67, 472-73, 497). In connection with the current social security claim, she also underwent a forensic psychiatric examination by David Stang, Psy.D. (T. 370-77). A state agency psychologist, H. Ferrin, Ph.D., conducted a medical records review and completed a Childhood Disability Evaluation Form.[5] (T. 380-85).

---

[4] T.T. was initially identified as a preschool student with a disability in November 2002. (T. 152). At that time, she was recommended for special class services as well as occupational, physical, and speech therapy services. (T. 152). In kindergarten, she integrated into regular education most of the day. (T. 152). In 2005-06, she was placed in regular education for first grade, but struggled with reading, math, and discipline. (T. 152). In April 2006, she was identified as a student with a learning disability and recommended to receive resource services. (T. 152). She repeated first grade. (T. 153). At an amendment meeting in 2007, her "resource time" was increased. (T. 152). Her IEP dated March 5, 2009, notes that T.T. needs support in all academic areas. (T. 188-202). Her report card dated January 2011 showed poor marks. In 2011-12, to obtain more support and assistance, she was reassigned to a school in Verona, which is outside of her zoned attendance in Rome. (T. 47).

[5] This is an official form, SSA-538-F6, titled Childhood Disability Evaluation Form. (T. 380-85).

Treating physician Komareth diagnosed T.T. as having Disruptive Behavior Disorder, NOS;[6] Learning Disorder, NOS; Mood Disorder, NOS (provisional), and ADHD, combined type (provisional). (T. 473). In connection with the current claim, Dr. Komareth was asked to complete an "ADHD Questionnaire."[7] (T. 497). On that form, Dr. Komareth rescinded his original ADHD diagnosis stating "Diagnosis is changed to Mood Disorder NOS." (T. 497). He also added, "She has a major mental disorder and I suspect bipolar disorder." (*Id.*).

The examining psychologist, Dr. Stang, diagnosed T.T. as having ADHD, oppositional defiant disorder, rule out depressive disorder, nos; and borderline intellectual functioning. (T. 377). The reviewing state agency psychologist did not express an independent diagnosis. (T. 380-85).

All three medical sources, as well as T.T.'s teachers and counselors, expressed opinions regarding T.T.'s functional limitations. Dr. Komareth opined that T.T. has marked limitations in acquiring and using information; attending and completing tasks; interacting with others; and caring for herself, but no limitation in moving about and manipulating objects or in health and physical well being. (T. 464-67). Dr. Stang observed that T.T. had difficulty performing calculations and serial 3 exercises, but was able to perform serial 2 exercises and recall three out of three objects following a five-minute delay. (T. 376). He stated that T.T.'s intelligence testing furnished evidence of borderline intellectual functioning; however, the results seemed to slightly underestimate T.T.'s intellectual abilities. (*Id.*). Finally, Dr. Ferrin opined concluded that T.T.

---

[6] NOS is an abbreviation for "not otherwise specified." *Mitchell v. Colvin*, No. 09-CV-5429 (ENV), 2013 WL 5676289, at *2 n.4 (E.D.N.Y. Oct. 17, 2013).

[7] The Index of Exhibits identifies it as "Medical Source Statement - Mental dated 07/22/2011, from V. Komareth, MD."

has less than marked limitations in acquiring and using information, attending and completing tasks and interacting with others, but no limitations in moving about and manipulating objects; caring for herself; and health and physical well being. (T. 382-83).

Despite her behavioral and academic problems and what one of her teachers accurately described as a "dysfunctional home situation," not everything is negative. A medication prescribed in February, 2011, (Risperdal) is, in her grandmother's opinion, somewhat effective in suppressing T.T.'s uncontrollable rage. (T. 60-61). Even so, T.T. still gets angry and stays depressed. (T. 61). Neither T.T.'s teacher nor her treating psychiatrist know whether T.T. takes that medication regularly. (T. 313, 467). Second, T.T.'s teachers believe that T.T. might thrive athletically and even academically if she had a good home environment. (T. 255, 258, 261, 314).

## II.  Administrative Decision

After an initial, administrative denial, T.T.'s case was assigned to administrative law judge John P. Ramos ("ALJ Ramos"), who conducted a video evidentiary hearing on November 4, 2011. (T. 11, 40-72). Plaintiff and T.T. appeared, represented by counsel, Peter W. Antonowicz, Esq. (*Id.*). ALJ Ramos received into evidence testimony from Plaintiff, forensic reports from state agency consultants, and T.T.'s medical and school records. (*Id.*).

*A.  Eligibility for Child Benefits*

Supplemental Security Income ("SSI"), usually a public benefits system for needy aged, blind, or disabled *adult* individuals, also provides that:

> *[a]n individual under the age of 18 . . .* [may receive benefits] . . . . if that individual has a *medically determinable . . . mental impairment, which results in marked and severe functional limitations*, and which can be

expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(C)(i) (emphasis added).

## B. *Sequential Evaluation*

Social Security Administration regulations establish a three-step, sequential analysis to determine child-benefits eligibility. 20 C.F.R. § 416.924(a). First, administrative judges determine whether a child is engaged in substantial gainful activity.[8] 20 C.F.R. § 416.924(b). If not, they next consider at Step 2 whether the child has a "medically determinable impairment that is severe." *Id.* § 416.924(c).[9] If so, administrative judges proceed to Step 3 to determine whether the impairment "medically equals" or "functionally equals" a disability listed in a "Listing of Impairments." *Id.* § 416.924(c)-(d). When a child has such an impairment or combination of impairments that has lasted or is expected to last for a continuous period of at least 12 months, the child is deemed disabled and entitled to benefits. 20 C.F.R. § 416.924(d)(1).

When a child's functional limitations do not *medically equal* the "Listing of Impairments," they are evaluated at Step 3 for *functional equivalence.* There, an adjudicator considers how a child functions in activities of everyday life called "domains" that delineate "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). The six domains are:

(i) Acquiring and using information;
(ii) Attending and completing tasks;
(iii) Interacting and relating with others;

---

[8] The provision excludes from coverage any "individual under the age of 18 who engages in substantial gainful activity...." 42 U.S.C. § 1382c(a)(3)(C)(ii).

[9] For a child, a medically determinable impairment or combination of impairments is *not severe* only when it is a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations. 20 C.F.R. § 416.924(c).

  (iv) Moving about and manipulating objects;
  (v) Caring for yourself; and,
  (vi) Health and physical well-being.

20 C.F.R. § 416.926a(b)(1)(I)-(vi). A medically determinable impairment or combination of impairments "functionally equals" a listed impairment when it "results in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain."[10] *Id.* § 416.926a(a). Social Security Ruling (SSR) 09–1p directs an administrative law judge to consider the "whole child." This approach requires administrative law judges to consider a child's everyday activities, determine all domains involved in performing them, consider whether that child's medically determinable impairment(s) account for limitations in activities, and determine what degree impairment(s) limit that child's ability to function age-appropriately in each domain. SSR 09-1p, TITLE XVI: DETERMINING CHILDHOOD DISABILITY UNDER THE FUNCTIONAL EQUIVALENCE RULE–THE "WHOLE CHILD" APPROACH, 2009 WL 396031, at *2-3 (SSA Feb. 17, 2009).

## C. *ALJ Ramos's Findings and Conclusions*

ALJ Ramos determined at Step 1 that T.T. did not engage in substantial gainful activity after her application date. (T. 14). At Step 2, ALJ Ramos found that T.T. has a mood disorder, which constitutes a "severe" impairment within the meaning of the Act. (T. 14). At Step 3, ALJ Ramos found that T.T. does not have an impairment or combination of impairments that meets, medically equals or functionally equals one of the listed impairments. (T. 14-22). Consequently, ALJ Ramos concluded that T.T. was not disabled. (T. 22).

---

[10] A "marked" limitation" interferes seriously with ability to independently initiate, sustain, or complete activities. *See* 20 C.F.R. § 416.926a(e)(2)(i). An "extreme" limitation means "more than marked," and represents an impairment which "interferes very seriously with . . . ability to independently initiate, sustain, or complete activities," and this rating is only "give[n] to the worst limitations." 20 C.F.R. § 416.926a(e)(3).

Two decisional factors are integral to the above Step 3 findings. First, ALJ Ramos chose to give "substantial weight" to the opinions of the state agency reviewing psychologist (Dr. Ferrin), but only "partial weight" to the opinions of treating physician (Dr. Komareth) regarding T.T.'s functional limitations. Second, ALJ Ramos concluded that T.T.'s limitations in acquiring and using information "can often be attributed to correctable problems as opposed to innate limitations." (T. 18). He also found that T.T.'s "limitations in her ability to complete task[s] is not due to an (*sic*) innate limitations but rather an unstable home environment, poor school attendance, and behavioral issues." (T. 19).

The Appeals Council denied Plaintiff's request to review on October 25, 2012. (T. 1-7). This rendered ALJ Ramos's opinion the final decision. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000). Plaintiff timely instituted this case on November 6, 2012. (Dkt. No. 1).

### III. Alleged Errors

Plaintiff argues that ALJ Ramos committed multiple errors. Specifically, Plaintiff contends that ALJ Ramos erred in failing to:

1. properly find that the Plaintiff's learning disability was a sever (*sic* for "severe") impairment;
2. properly assess and weigh the medical evidence; and
3. find functional equivalence.

(Dkt. No. 13, p. 1, 19-21). Point 1 maintains that ALJ Ramos erred in failing to classify T.T.'s *learning disorder* as a severe impairment. (Dkt. No. 13, pp. 19-21). Plaintiff points to school records (*e.g.*, Individualized Education Program, report cards, *etc.*), T.T.'s receipt of increasingly intense special accommodations, and responses on teacher questionnaires that T.T. has "serious" and "very serious" problems in several domains as "overwhelming evidence" of T.T.'s

learning disability. (*Id.*). Point 2 argues that ALJ Ramos disregarded the "treating physician rule,"[11] and did not apply criteria set forth in 20 C.F.R. § 416.927 properly when deciding how much weight to afford medical source opinion.[12] Plaintiff contends that this error resulted in ALJ Ramos giving undue weight to consultative source opinion. Finally, Point 3 argues that evidence of record establishes that T.T. suffers from marked limitations in her ability to function in four domains (*i.e.*, acquiring and using information; attending and completing tasks; interacting and relating with others; and caring for herself), such that ALJ Ramos erred when declining to find that T.T. has an impairment or combination of impairments that functionally equals one of the listed impairments. (*Id.*).

The Commissioner responds that ALJ Ramos's Step 2 finding is supported by substantial evidence, and, alternatively, that even if there were an erroneous Step 2 finding, the error is harmless because ALJ Ramos continued to Step 3 of the sequential evaluation where he considered functional effects of T.T.'s impairments. The Commissioner further argues that ALJ Ramos's weighting of medical opinion was in accordance with the governing regulation and interpretive rulings, and his election to give "substantial weight" to the opinion of the state agency reviewing psychologist while affording only "partial weight" to the opinion of T.T.'s treating physician was within his discretion and

---

[11] Administrative law judges must give "controlling weight" to opinions of treating sources regarding the nature and severity of impairments, provided they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the case record. 20 C.F.R. § 416.927(c)(2); *see also* SSR 96-2p, TITLES II AND XVI: GIVING CONTROLLING WEIGHT TO TREATING SOURCE MEDICAL OPINIONS, 1996 WL 374188, at *1 (SSA July 2, 1996) (explaining controlling-weight factors).

[12] When controlling weight is not given to a treating source's opinion, the administrative law judge must consider certain factors to determine how much weight to assign that opinion: existence, length and nature of a treatment relationship; frequency of examination; evidentiary support offered; consistency with the record as a whole; and specialization. *See* 20 C.F.R. § 416.927(c).

supported by substantial evidence. Finally, the Commissioner argues that substantial evidence supports ALJ Ramos's functional equivalency findings. Therefore, the decision denying benefits should be affirmed. (Dkt. No. 14, pp. 5-17).

## IV. Discussion and Analysis

For reasons stated below, a searching investigation of the record raises concerns that T.T.'s application did not receive a full and fair hearing in accordance with the beneficent purposes of the Social Security Act. Thus, it is premature for the court to address the parties' opposing arguments on their merits, or to determine whether errors, if any, are harmless.[13] Rather, the matter should be remanded for further development of the record. *See Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) ("Before determining whether the Commissioner's conclusions are supported by substantial evidence, however, we must first be satisfied that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the Social Security Act. The Act must be liberally applied, for it is a remedial statute intended to include not exclude.") (internal quotations and citations omitted).

### A. *Duty to Develop a Full Record*

When evidence in hand is inadequate to determine whether a claimant is disabled, an administrative law judge should re-contact a treating physician or other medical sources and request additional information. 20 C.F.R. §§ 416.912(e), 416.920(c); *see also Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) ("[W]here there are deficiencies in the record, an ALJ is under an

---

[13] Congress directs courts, when reviewing acts of administrative agencies, to take "due account" of "the rule of prejudicial error." 5 U.S.C. § 706.

affirmative obligation to develop a claimant's medical history 'even when the claimant is represented by counsel . . . . ' "; an administrative law judge may not rely on sparse notes nor conclusory assessments from the treating physician); *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) (when there is an inadequate medical record, an administrative law judge must *sua sponte* seek additional information); *Devora v. Barnhart*, 205 F. Supp.2d 164, 172–73 (S.D.N.Y. 2002) ("The duty of the ALJ to develop the record is particularly important when it comes to obtaining information from a claimant's treating physician.").

Similarly, an administrative law judge cannot arbitrarily substitute his own judgment for competent medical opinion. *See Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (internal quotations omitted); *see also Filocomo v. Chater*, 944 F. Supp. 165, 170 (E.D.N.Y. 1996) ("In the absence of supporting expert medical opinion, the ALJ should not have engaged in his own evaluations of the medical findings.").

An administrative law judge's failure to develop the record adequately is an independent ground for vacating the administrative law judge's decision and remanding the case. *See Moran,* 569 F.3d at 114-15 ("We vacate not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision."); *see also Daviau v. Astrue,* No. 09–CV–0870 (MAD), 2012 WL 13543, at *6 (N.D.N.Y. Jan. 4, 2012) (citing *Yankus v. Astrue*, No. 07-CV-0316 (JFB), 2008 WL 4190870, at *6 (E.D.N.Y. Sept. 10, 2008) (where the administrative law judge fails to fully develop the record in accordance with the Second Circuit's mandate for *pro se* claimants, the Court cannot determine, as a matter of law, whether substantial evidence supports the administrative law judge's findings)). Indeed, decisions based on improper medical findings or diagnoses made by a lay

administrative law judge are not supported by substantial evidence. *See Gonzalez ex rel. C.C. v. Astrue*, Civil Action No. 1:07–cv–487 (GLS/VEB), 2009 WL 4724716, at *4-5 (N.D.N.Y. Dec. 2, 2009).[14]

## B.   *Ambiguity and Incompleteness Regarding T.T.'s Mental Impairments*

Dr. Komareth diagnosed T.T.'s mental impairments as including disruptive behavior disorder, learning disorder, mood disorder, and ADHD. (T. 473). ALJ Ramos, however, found that T.T.'s *"only diagnosis is Mood Disorder."* (T. 14) (emphasis added). To reach this conclusion, ALJ Ramos relied on a ADHD Questionnaire wherein Dr. Komareth rescinded an earlier ADHD diagnosis, and stated, "Diagnosis is changed to Mood Disorder NOS." (T. 497).

That questionnaire exclusively concerned ADHD. In that context, Dr. Komareth's statement literally applied only to his original ADHD diagnosis. Nothing in the questionnaire states that Dr. Komareth also changed or rescinded his other diagnoses. Hence, the questionnaire does not give rise to a permissible inference that T.T.'s only mental impairment is mood disorder.

Dr. Komareth also completed a Functional Equivalence Assessment that reported a single diagnosis of mood disorder. In that assessment, however, Dr.

---

[14]   In *Gonzalez*, the Court thoroughly reviews this issue:

```
...the ALJ may not make his own diagnosis based upon the signs,
symptoms, and laboratory findings of record. Goldthrite v. Astrue,
535 F. Supp.2d 329, 339 (W.D.N.Y. 2008) ("An ALJ must rely on the
medical findings contained within the record and cannot make his own
diagnosis without substantial medical evidence to support his
opinion."); see 20 C.F.R. § 416.927(a)(2) (explaining that diagnoses
are medical opinions from physicians or psychologists). Indeed, the
Second Circuit has repeatedly warned ALJs from "improperly set[ting]
[their] own expertise against that of the treating physician." Rosa
v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) (quoting Balsamo v.
Chater, 142 F.3d 75, 81 (2d Cir. 1998)).
```

*See Gonzalez ex rel. C.C. v. Astrue*, Civil Action No. 1:07–cv-487 (GLS/VEB), 2009 WL 4724716, *3 (N.D.N.Y. Dec. 2, 2009)

Komareth opined that T.T. has marked limitations in acquiring and using information. Specifically, Dr. Komareth noted that "Ct (*sic*) has many problems in school[.] [S]he reports that she does not understand the work[.] [H]er reading appears to be limited." (T. 464). Again, this does not suggest that Dr. Komareth intentionally abandoned his original assessment that T.T. is impaired by a learning disorder.

Dr. Komareth's questionnaire and functional equivalence assessments are ambiguous. Neither the examining physician, Dr. Stang, or the reviewing psychologist, Dr. Ferrin, purported to rule out learning disorder and disruptive behavior disorder as impairments. Given these circumstances, ALJ Ramos had a duty to re-contact Dr. Komareth for clarification as to his current diagnoses before finding that T.T.'s only impairment is a mood disorder. Dr. Komareth intentionally may have removed learning disorder and disruptive behavior disorder as impairments or simply did not find them responsive to the forms he was asked to complete. ALJ Ramos, however, made no effort to determine what the reasons were, or to obtain that vital information otherwise.

This gap is accentuated by Dr. Komareth's gratuitous ADHD questionnaire answers wherein he raised for the first time possibilities that T.T. has a previously undiagnosed bipolar disorder and another unspecified "major mental disorder." Given his duty to investigate and develop facts and arguments both for and against the granting of benefits, ALJ Ramos should have re-contacted Dr. Komareth for additional records on these potential impairments. *See Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999).

At a minimum, evidence of record creates an ambiguity as to whether T.T. maintains a diagnosis of learning disorder. Given the breadth and longitude of that diagnosis, it seems unlikely that it simply disappeared. Neither the court

nor ALJ Ramos, however, has medical expertise to make that determination, or a similar determination regarding disruptive behavior disorder.

C. *Lay Medical Diagnosis*

As reported above (Section II.*C.*), ALJ Ramos concluded that T.T.'s limitations (in acquiring and using information and in completing tasks) are not functionally equivalent to a listing of presumptively disabling impairments because they are not "innate," but rather attributable to an unstable home environment, poor school attendance, and "behavioral issues." Thus, they are "correctable problems."

These findings are not supported by any medical opinion. If anything, they contradict Dr. Komareth's unexplored notation that T.T. "has a major mental disorder and I suspect bipolar disorder." (T. 497). While non-medical sources, *e.g.,* T.T.'s teachers, believe that a dysfunctional home environment negatively affects T.T.'s academic performance, the record also reflects that T.T.'s grandmother, her mother and at least one sibling all suffer from disabling mental impairments. A longitudinal family history of mental disease counters ALJ Ramos's intuition that T.T.'s limitations are not "innate."

This, then, is another gap in the administrative record. If T.T.'s claim for benefits hinges on whether her limitations are "correctable" because they are not "innate," ALJ Ramos had a duty to obtain medical source opinion on those issues.

D. *Conclusion*

One is hard-pressed to imagine a circumstance where an administrative law judge's duty to investigate and develop facts and arguments both for and against the granting of benefits is more crucial than in this case, where an

impoverished, mentally disabled grandmother seeks modest supplemental security income benefits for her ward, a legally-incompetent, orphaned and mentally-impaired minor. ALJ Ramos erred by not pursuing any means, by further inquiry of Dr. Komareth or otherwise, to fill gaps in the record identified above. Accordingly, his decision must be vacated and remanded to the Commissioner. *See, e.g., Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996).

## V. Recommendation

The Commissioner's decision denying disability-based benefits should be **REVERSED**. The action should be remanded for further proceedings necessary to develop a full evidentiary record.

## VI. Objections

Parties have fourteen (14) days to file specific, written objections to the Report and Recommendation. Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THE REPORT, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Graham v. City of New York*, 443 Fed. App'x 657, 658 (2d Cir. 2011); *FDIC v. Hillcrest Assocs.*, 66 F.3d 566, 569 (2d Cir. 1995); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Signed on the  22   day of   November    2013.

*[signature: Earl S. Hines]*
Earl S. Hines
United States Magistrate Judge